24-7422-JCB

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Paul M. Callahan, being duly sworn, state under oath:

**Introduction and Agent Background**

1. I am currently a deputized Task Force Officer with the United States Drug Enforcement Administration ("DEA"), assigned to the DEA-New England Field Division's Tactical Diversion Squad ("TDS") in Boston, Massachusetts. Investigators assigned to TDS primarily investigate the illegal diversion of pharmaceuticals. As a Task Force Officer with the DEA, I am an "investigative or law enforcement officer of the United States," within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516. I have been a police officer since 1999 and have served as a police officer in the Town of Burlington, Massachusetts since February 2003.

2. I have had extensive experience in the investigation of the activities of drug traffickers. During my career as a police officer, I have been involved in over 500 arrests, most of which were for narcotic-related violations. I have participated in the execution of over 100 search warrants resulting in arrests and seizures of illegal substances and all types of evidence. I have participated in hundreds of drug investigations, both in leadership and subsidiary roles. I have debriefed numerous defendants, informants, and witnesses with personal knowledge about drug trafficking activities, and the operation of drug trafficking organizations. I personally have participated in almost all aspects of drug trafficking investigations, including, but not limited to, conducting surveillance, acting in undercover capacities, using confidential informants and conducting court-ordered wire and electronic surveillance. I have served as both a surveillance agent and a monitoring agent on several other wiretap investigations.

3. Based on my training and experience, I am familiar with drug traffickers' methods of operation, including the distribution, storage and transportation of drugs, and the collection of money that constitutes the proceeds of drug trafficking activities. Moreover, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute drugs and the proceeds of drug trafficking.

4. The information contained in this affidavit is based on statements and information from witnesses, my personal knowledge and observations during the course of this investigation, my personal training and experience as a criminal investigator, intelligence obtained from other agents, and my review of records, documents, and other physical evidence obtained during this investigation.

5. Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, state, national and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities. Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute drugs and the proceeds of drug trafficking. I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."

6. Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and in furtherance of their drug trafficking activities, but are wary of law enforcement's use of electronic surveillance and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular

telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement. As a result of my training and experience, I am familiar with the manner in which drug traffickers use telephones; coded, veiled, or slang language in telephone conversations; electronic text messages; and other means to facilitate their illegal activities. I am also familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversations and operations. Based on my training and experience, I understand that tracking the location of drug traffickers frequently leads to evidence of drug and money laundering offenses, including, but not limited to: (a) the identification of potential criminal associates, such as criminal co-conspirators, suppliers of illegal drugs, and money launderers; (b) the identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; and/or (c) the identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions, and laundered; including private businesses, banks, wire-remitter businesses, and other financial institutions.

## Purpose of the Affidavit

7.  Since at least as early as September 2024, I have been investigating Jorge Manuel Huertas ("HUERTAS") for conspiracy to distribute and possess with the intent to distribute controlled substances, in violation of 21 U.S.C. § 846.

8.  I am submitting this affidavit in support of an application for a criminal complaint charging that, on or about September 17, 2024 HUERTAS, conspired to distribute and possess with intent to distribute more than 50 grams of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance; and more than 40 grams of

3

fentanyl, a schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(b)(1)(B)(vi), and 841(b)(1)(B)(viii) (the "Target Offense"). Based on the facts set forth in this affidavit, there is probable cause to believe that HUERTAS has committed the Target Offense.

9. This affidavit is being submitted for the limited purpose of obtaining a criminal complaint and arrest warrant for HUERTAS. As a result, I have not included each and every fact known to me and other law enforcement officers involved in the investigation of HUERTAS in which I have participated since September 2024. Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested complaint and arrest warrant.

10. I am familiar with the facts and circumstances of the investigation of HUERTAS based on information I have received from a variety of sources, including but not limited to my own personal participation in the investigation; oral and written reports and documents that I have received from the U.S. Drug Enforcement Administration ("DEA"), and other federal, state, and local law enforcement agents; physical and electronic surveillance conducted by me and other federal, state, and local law enforcement agents; confidential sources of information; public records; business records; telephone toll records, pen registers and trap and trace information, and telephone subscriber information; precise location information for cellular telephones; and controlled purchases of narcotics.

## Probable Cause

11.  In September 2024, members of the DEA Boston Tactical Diversion Squad interviewed a cooperating witness (hereinafter, "CW-1").[1] CW-1 began cooperating with DEA in October 2023. During the course of the interview, CW-1 provided investigators with information about HUERTAS, whom CW-1 identified as a source of supply for pressed fentanyl.

12.  In the days prior to September 17, 2024, CW-1 spoke with HUERTAS over the phone to arrange the purchase of 2,500 counterfeit oxycodone pills containing fentanyl. Phone calls between CW-1 and HUERTAS were not recorded, but WhatsApp messages and voice memos sent among CW-1 and HUERTAS have been preserved. The parties agreed that the transaction would take place after 5:00 p.m. on September 17, 2024, at Highland Variety at 146 Pine Street, Lowell, Massachusetts.

13.  On September 17, 2024, at 5:00 p.m., investigators met with CW-1 at a pre-designated meeting location. During this meeting, investigators searched CW-1 for money and contraband and found none. Investigators then provided CW-1 with $2,500 in official agency funds and equipped him with an audio and video recording device.[2]

---

[1] On October 26, 2023, investigators executed a search warrant at CW-1's residence and stash location. Investigators recovered a quantity of counterfeit oxycodone pills containing fentanyl, a quantity of U.S. currency, a firearm, and ammunition. Investigators previously conducted controlled purchases from CW-1 for approximately 200 grams of fentanyl. CW-1 was not charged for this conduct and is cooperating in consideration relative to future charges for this conduct. CW-1 has no other criminal history in the last ten years. I have been able to corroborate information that CW-1 has provided to investigators. I believe him to be reliable.

[2] The video recording device did not function correctly during this controlled purchase.

14. At approximately 5:12 p.m., investigators observed CW-1 enter Highland Variety. Minutes later, investigators observed CW-1 exit Highland Variety and travel to HUERTAS's residence at 124 Lafayette Street, Lowell, Massachusetts. I later learned from CW-1 that HUERTAS had directed CW-1 to his residence after CW-1 arrived at Highland Variety.

15. At approximately 5:36 p.m., investigators observed CW-1 enter HUERTAS's residence. Once inside, HUERTAS informed CW-1 that he was only in possession of 1,500 of the requested 2,500 fentanyl pills, but that he could have the remaining 1,000 pills within one hour. CW-1 told HUERTAS that he did not want to wait that long. HUERTAS said that he could obtain 900 counterfeit Adderall pills containing methamphetamine from his son who lived "down the street."

16. At 5:51 p.m., investigators observed HUERTAS and CW-1 exit HUERTAS's residence and drive to 244 West 6th Street, Lowell, Massachusetts. Once there, HUERTAS and CW-1 met with another individual whom HUERTAS identified as his son. This individual provided CW-1 with 900 counterfeit Adderall pills containing methamphetamine. HUERTAS and CW-1 then travelled back to HUERTAS's residence, where CW-1 reentered his car and drove back to meet with investigators at a pre-determined meeting location. There, CW-1 provided investigators with $100 (because HUERTAS only provided CW-1 with 2,400 pills rather than 2,500 pills), as well as the 2,400 pills which CW-1 had just purchased from HUERTAS. Laboratory testing confirmed that the counterfeit Adderall pills weighed 298.738 grams and contained methamphetamine; and that the counterfeit oxycodone pills weighted 171.263 grams and contained fentanyl.

17. Based on the foregoing as well as my training and experience, I believe that HUERTAS conspired with his son to distribute counterfeit Adderall pills containing methamphetamine and counterfeit oxycodone pills containing fentanyl.

## CONCLUSION

18. Based on the foregoing, I submit that there is probable cause to believe that on or about September 17, 2024, HUERTAS conspired to distribute and possess with the intent to distribute more than 50 grams of a mixture or substance containing methamphetamine, a Schedule II controlled substance; and more than 40 grams of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(b)(1)(B)(vi), and 841(b)(1)(B)(viii).

Respectfully submitted,

Paul M. Callahan
Task Force Officer
Drug Enforcement Administration

Subscribed to and sworn before me telephonically in accordance with the requirements of Fed. R. Crim. P. 4.1 on this the 15th day of October, 2024.

HON. JENNIFER C. BOAL
United States Magistrate Judge